UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CYNTHIA MEADOWS, | ) | CASE NO. 1:12-CV-341 |
| *o/b/o* R.M. | ) | |
| | ) | MAGISTRATE JUDGE MCHARGH |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to the consent of the parties.  (Doc. 12). The issue before the undersigned is whether the final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying Plaintiff Cynthia Meadows' application for Supplemental Security Income benefits, on behalf of her child R.M., under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.*, is supported by substantial evidence, and therefore, conclusive.

For the reasons stated below, the undersigned AFFIRMS the decision of the Commissioner.

I. INTRODUCTION & PROCEDURAL HISTORY

Plaintiff Cynthia Meadows ("Plaintiff" or "Meadows"), on behalf of her child, R.M., applied for Supplemental Security Income benefits on March 10, 2009.  (Tr. 153-55).  Plaintiff alleged R.M. became disabled on January 1, 2001, due to suffering from a learning disability and attention deficit hyperactivity disorder ("ADHD").  (Tr. 153, 170).  The Social Security Administration denied Plaintiff's application for benefits initially and upon reconsideration.  (Tr. 76-79, 83-88, 93-99).  Thereafter, Meadows requested a hearing before an administrative law

judge to contest the denial of her application.  (Tr. 100). The administration granted Plaintiff's request and scheduled a hearing.  (Tr. 108-13).

On April 28, 2011, Administrative Law Judge Julia Terry (the "ALJ") convened a hearing via video to evaluate Meadows' application.  (Tr. 33-75).  Plaintiff, R.M. and counsel appeared in Cleveland, Ohio, and the ALJ presided over the proceeding from St. Louis, Missouri.  (Tr. 11).  On July 22, 2011, the ALJ issued an unfavorable decision denying Plaintiff's application for benefits.  (Tr. 11-25).  Subsequently, Meadows sought review of this decision from the Appeals Council.  (Tr. 7). However, the council denied Plaintiff's request thereby making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).  Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 1383(c).

## II.  PERSONAL BACKGROUND

R.M. was born on June 6, 1996, and was 14 years old and in the ninth grade at the time of his hearing before the ALJ.  (Tr. 41, 77).  He lives with his mother, father and sister.  R.M. attends school in a special education class with only five other students.  (Tr. 41-42).  He denies having any friends at school, but has two friends that live in his neighborhood.  (Tr. 42-43).  He likes playing basketball and was on his junior high school's basketball team.  (Tr. 42, 45).

## III.  STANDARD FOR CHILDHOOD SSI CASES

A child under age eighteen will be considered disabled if he or she has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations." 42 U.S.C. § 1382c(a)(3)(C)(i).  Childhood disability claims involve a three-step process to evaluate whether the child claimant is disabled.  20 C.F.R. § 416.924.  First, the ALJ must determine whether the child claimant is working.  If not, at step two the ALJ must decide whether the child claimant has a severe mental or physical impairment  Third, the ALJ must

consider whether the claimant's impairment(s) meet or equal a listing under 20 C.F.R. Part 404, Subpart P, Appendix 1. An impairment can equal the listings medically or functionally. 20 C.F.R. § 416.924.

A child claimant medically equals a listing when the child's impairment is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a). Yet, in order to medically equal a listing, the child's impairment(s) must meet all of the specified medical criteria. "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530-32 (1990).

A child claimant will also be deemed disabled when he or she functionally equals the listings. The regulations provide six domains that an ALJ must consider when determining whether a child functionally equals the listings. These domains include:

(1) Acquiring and using information;

(2) Attending and completing tasks;

(3) Interacting and relating with others;

(4) Moving about and manipulating objects;

(5) Caring for yourself; and,

(6) Health and physical well-being.

20 C.F.R. § 416.926a(b)(1). In order to establish functional equivalency to the listings, the claimant must exhibit an extreme limitation in at least one domain, or a marked impairment in two domains. 20 C.F.R. § 416.926a(d).

The regulations define "marked" and "extreme" impairments:

We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities...[it] also means a limitation that is "more than

3

>moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

20 C.F.R. § 416.926a(e)(2)(i).

>We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities...[it] also means a limitation that is "more than marked." "Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing scores that are at least three standard deviations below the mean.

20 C.F.R. § 416.926a(e)(3)(i).

During the evaluation of a child disability claim, the ALJ must consider the medical opinion evidence in the record provided by the child's treating physicians. 20 C.F.R. § 416.927(c). The ALJ must also account for the opinions of the non-examining sources, such as state agency medical consultants, and other medical opinions in the record. 20 C.F.R. § 416.927(e)(2)(i-ii). Additionally, the regulations require the ALJ to consider certain other evidence in the record, such as information from the child's teachers, 20 C.F.R. § 416.926a(a), and how well the child performs daily activities in comparison to other children the same age. 20 C.F.R. § 416.926a(b)(3)(i-ii).

## IV. STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence and whether, in making that decision, the Commissioner employed the proper legal standards. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "Substantial evidence" has been defined by the Sixth Circuit as more than a scintilla of evidence, but less than a

preponderance of the evidence. See *Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524, 535 (6th Cir. 1981)*. Thus, if a reasonable mind could accept the record evidence as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.* While the Court has discretion to consider the entire record, this Court does not determine whether issues of fact in dispute would be decided differently, or if substantial evidence also supports the opposite conclusion. The Commissioner's decision, if supported by substantial evidence, must stand. See *Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986)*; *Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983)*.

This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. See *Garner, 745 F.2d at 387*. However, it may examine all evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. See *Walker v. Sec'y of Health & Human Servs., 884 F.2d 241, 245 (6th Cir. 1989)*.

## V. ALJ's DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant was born on June 6, 1996. Therefore, he was an adolescent on March 10, 2009, the date the application was filed, and is currently an adolescent.

2. The claimant has not engaged in substantial gainful activity at any time relevant to this decision.

3. The claimant has the following severe impairments: oppositional defiant disorder; attention deficit hyperactivity disorder; a personality disorder; a psychotic disorder; and major depression.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

> 5. The claimant does not have an impairment or combination of impairments that functionally equals the listings.
>
> 6. The claimant has not been disabled, as defined in the Social Security Act, since March 10, 2009, the date the application was filed.

(Tr. 14-24) (internal citations omitted).

## VI. ANALYSIS

Plaintiff challenges the ALJ's decision on three grounds. Meadows' first assignment of error maintains the ALJ improperly assessed R.M.'s intellectual functioning. Next, Plaintiff asserts the ALJ's evaluation of R.M's treating physician's opinion was erroneous. Lastly, Meadows contends the ALJ also erred in the weight she attributed the opinions of consultative examiner, Dr. David House. None of these arguments justify reversal or remand.

### 1. R.M.'s IQ Score

R.M. was administered intelligence tests at three different points in time. First, on February 4, 2004, the child took the Wechsler Intelligence Scale for Children-Fourth Edition test. (Tr. 495). He received a 79 in verbal comprehension; 98 in perceptual reasoning; 94 in working memory; 109 in processing speed and a full scale score of 91. (*Id.*). All of these scores placed R.M. in the average or high average range, save his verbal comprehension score which fell in the borderline range. (*Id.*).

R.M. took this test again in 2006 when he was 10 years old. (Tr. 569-74). It was administered to him by Dr. J. Joseph Konieczny. (Tr. 569). His scores were as follows: 69 in verbal comprehension; 71 in perceptual reasoning; 80 in working memory; 59 in processing speed; and a full scale score of 62. (Tr. 571). The index scores generally ranked R.M. in the low average to borderline range, and his full scale score placed him in the extremely low range. (*Id.*). However, Dr. Konieczny commented, "[a]lthough results of the intellectual testing place

[R.M.'s] capabilities in a range that could suggest a diagnosis of Mild Mental Retardation or Borderline Intellectual Functioning, . . . his effort during the testing seemed quite poor." (Tr. 573). Consequently, the doctor refrained from making any diagnosis regarding R.M.'s intellectual functioning. (*Id.*).

Finally, in 2010, Plaintiff was administered the same test for a third time by his school psychologist, Brian Knoske. (Tr. 413). R.M. received a 79 in verbal comprehension; 75 in perceptual reasoning; 71 in working memory; and 73 in processing speed. (*Id.*). The first three scores fell within the borderline range, and the final score fell in the low average range. (*Id.*). Plaintiff's full scale score was 72 and also fell in the borderline range. (*Id.*).

In her discussion of whether R.M.'s impairments met or medically equaled listing level, the ALJ analyzed each of R.M.'s full scale test scores. (Tr. 14-15). The ALJ specifically considered whether R.M.'s impairments, individually or in combination, satisfied the requirements of Listing 112.05(D) or (E) for mental retardation. (*Id.*). In doing so, the ALJ discounted R.M.'s two latter full scale IQ scores. (Tr. 15). The ALJ explained that Dr. Konieczny himself discredited the results of the test he conducted in 2006, and noted that there was no evidence showing that Plaintiff's scores from 2010 were valid as the record did not show that R.M. had put forth an adequate amount of effort during this test. (*Id.*).

Plaintiff concedes that there were legitimate reasons for the ALJ to disregard R.M.'s 2006 scores, but argues the ALJ improperly questioned the child's 2010 scores. Meadows claims that because ALJs are not medical experts, the ALJ had no basis to challenge the validity of the 2010 scores on her own. Rather, Plaintiff argues the ALJ should have consulted with some type of medical expert to determine whether the 2010 scores were in fact flawed.

7

Though Plaintiff's argument has facial appeal, it is unavailing, even if accepted.  Plaintiff puts forth several theories on how the ALJ's alleged improper rejection of R.M.'s most recent scores negatively impacted her ruling.  However, none of these theories are strong enough to support reversing the ALJ's decision or remanding the case for further consideration.

To begin, Plaintiff admits that even if the ALJ had credited these scores, they were not sufficient to meet the requirements of Listing 112.05(D) or (E).  (*See* Pl.'s Br. at 12).  Thus, the ALJ's alleged faulty analysis had no impact upon this part of her ruling.

Nor would the acceptance of these scores necessarily have led the ALJ to find R.M. suffered from additional severe impairments at step two of the analysis.  Meadows highlights that all but one of the 2010 scores fell within the borderline range.  In turn, Plaintiff contends such scores *would have* supported a diagnosis of borderline intellectual functioning and intimates that the ALJ erred by omitting any intellectual impairment from her step two finding.  But such an argument is pure conjecture.  Plaintiff has not identified any medical evidence indicating that the child has been formally diagnosed with borderline intellectual functioning.  Furthermore, even if such evidence were proffered, the ALJ's failure to label the ailment as severe would not have warranted remand.  As noted by the Commissioner, the failure to label an impairment as severe at step two does not constitute reversible error so long as the ALJ finds the claimant has at least one severe impairment and continues to evaluate the claimant's severe and nonsevere impairments at the remaining steps of the analysis.  *Maziarz v. Sec'y of Health & Human Servs., 837 F.2d 240, 244 (6th Cir. 1987).*

Then, without presenting any supporting argumentation, Plaintiff concludes that the ALJ's *faulty* evaluation of R.M.'s IQ scores flawed her analysis of the child's impairments in the domains "dealing with intellectual function".  (Pl.'s Br. at 12).  But, "[i]t is well-established that

issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Geboy v. Brigano*, 489 F.3d 752, 767 (6th Cir. 2007) (quoting *Dillery v. City of Sandusky*, 398 F.3d 562, 569 (6th Cir. 2005)). In fact, to the contrary of Plaintiff's argument, neither the ALJ's discussion of R.M.'s abilities in the domain of Acquiring and Using Information or Attending and Completing Tasks made any reference to the child's IQ scores. As a result, it is not clear how these scores negatively affected the ALJ's ruling in these domains as Plaintiff suggests.

## 2. Treating Source's Opinion

Plaintiff's second assignment of error attacks the ALJ's decision to give limited weight to the findings of R.M.'s treating physician, Dr. Vidula Khadilkar, issued in May 2010. It is well-established that an ALJ must give special attention to the findings of a claimant's treating source. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The treating source rule indicates that opinions from such physicians are entitled to controlling weight if the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in the case record." *Id.* at 544. When a treating source's opinion is not entitled to controlling weight under this framework, the ALJ must determine how much weight to assign to the opinion by applying specific factors set forth in the governing regulations. 20 C.F.R. § 416.927(c)(2). The regulations also require the ALJ to provide "good reasons" for the weight ultimately assigned to the opinion. *Id.*

In October 2006, Dr. Khadilkar diagnosed R.M. with ADHD/hyperactivity and behavioral problems. (Tr. 645). However, the physician noted that the symptoms caused by R.M.'s hyperactivity were controlled with treatment. (Tr. 644). In October 2007, Dr. Khadilkar completed another assessment evaluating Plaintiff's impairments. (Tr. 607-09). The doctor

9

again reported that R.M.'s hyperactivity and ADHD symptoms responded to treatment, although R.M. still suffered from intermittent mood swings. (Tr. 609). Lastly, in May 2010, the doctor completed a questionnaire evaluating R.M.'s functionality in each of the six domains considered in child disability cases. (Tr. 718-20). In it, the doctor opined R.M. was "markedly limited" in the domains of Acquiring and Using Information and Attending and Completing Tasks; "moderately limited" in Interacting and Relating with Others; and had no limitation in the remaining three areas. (*Id.*).

The ALJ acknowledged the two marked limitations noted in Dr. Khadilkar's 2010 questionnaire but only assigned the opinion limited weight, finding that "[t]he claimant's history of improving with proper treatment d[id] not justify such limitations". (Tr. 19). Meadows argues this explanation does not constitute as a "good reason" to discount the doctor's assessment. She notes that although Dr. Khadilkar indicated Plaintiff's symptoms were somewhat controlled in 2006, by 2007 the doctor noted that R.M. was still oppositional and defiant and had continuing mood swings. (Tr. 608-09). Therefore, she contends the ALJ should not have rejected Dr. Khadilkar's 2010 findings.

At this stage in the analysis, the Court's role is limited to determining whether the ALJ applied the correct legal standards and whether there is substantial support in the record to uphold the ALJ's decision. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009). It is under this framework that the undersigned answers in the affirmative. In the instant case, it was reasonable for the ALJ to discount Dr. Khadilkar's later findings based on their inconsistency with the doctor's earlier opinion of R.M.'s impairments. The ALJ showed that there were significant differences between how the doctor viewed R.M.'s limitations historically versus his marked findings in 2010.

Although there is a noticeable three-year gap between the doctor's findings showing controlled symptoms and his latter opinion signaling marked impairments, there is other evidence in the record supporting the ALJ's decision. While not referenced by the ALJ, the undersigned notes that Dr. Khadilkar assessed R.M. again in April 2009. (Tr. 624-28). In this assessment, Dr. Khadilkar again noted that R.M.'s ADHD and hyperactivity problems showed "some improvement" although the child still exhibited behavior problems. (Tr. 626, 628). Moreover, when asked what limitations R.M.'s impairments imposed on the child's regular activities, including psychologically, Dr. Khadilkar responded, "NA". (*Id.*). This opinion by Dr. Khadilkar was provided much closer in time to his 2010 opinion and further illustrates the sharp contrast between the doctor's former and latter opinion of R.M.'s functional capacity.

The ALJ's decision to limit the weight assigned to Dr. Khadilkar's marked findings is also supported by the findings of the state agency physicians who reviewed R.M.'s medical record. Between June and July 2009, Drs. John Mormol and Robelyn Marlow, jointly assessed R.M.'s limitations in the six relevant domains. (Tr. 636-41). They opined R.M. had a "less than marked" limitation in the domains of Acquiring and Using Information, Attending and Completing Tasks, Interacting and Relating with Others and Health and Physical Well-Being; and "no limitation" in the remaining two domains. (*Id.*). In November 2009, two different state agency physicians, Drs. Sylvia Vasquez and Steven Meyer, reviewed R.M.'s file. (Tr. 647-52). They affirmed the prior assessment as written. (Tr. 652). The governing regulations recognize that state agency physicians are "highly qualified" and are experts in disability evaluation. 20 C.F.R § 416.927(e)(2)(i); SSR 96-6p. The close proximity between these doctors' review of R.M.'s medical file and Dr. Khadilkar's latest assessment, and the striking differences between the two opinions further bolsters the ALJ's decision to discredit Dr. Khadilkar's 2010 findings.

11

As a result, the undersigned finds that there is substantial evidence in the record to support the ALJ's treatment of Dr. Khadilkar's opinion. The Court notes that the ALJ did not fully reject the doctor's opinions. Instead, the ALJ indicated that she only gave the opinion "limited weight". (Tr. 19). Such a determination was within the ALJ's zone of choice and is justified by the record. *See Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986) ("there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

### 3. Consultative Examiner's Opinion

Finally, Meadows contests the ALJ's treatment of the opinion of consultative examiner, Dr. David House, a psychologist. Dr. House first examined R.M. on October 16, 2007. (Tr. 611-15). Dr. House diagnosed R.M. with major depression, severe with psychotic features and a Global Assessment of Functioning ("GAF") score of 40. (Tr. 615). The doctor also commented that R.M.'s concentration and attention were not limited and that his pace seemed adequate. (Tr. 613-14). Dr. House also examined R.M. on May 1, 2009. (Tr. 629-34). Again, the doctor assigned R.M. a GAF score of 40. (Tr. 634). However, this time Dr. House opined R.M.'s concentration and pace were deficient and that his pace, persistence and task completion were only one-half of the average functioning of a child his age. (Tr. 632-33).

The ALJ stated that he assigned great weight to the doctor's findings. But, Plaintiff notes that despite this finding, the ALJ rejected the GAF score announced by Dr. House. The ALJ indicated that she discounted Dr. House's GAF score because the doctor was relying on Plaintiff's reports that R.M. heard voices – allegations which the ALJ found were not substantiated in the medical record. (Tr. 19). Plaintiff challenges this finding. She contends the record indeed reflects that R.M. himself complained of hearing voices.

12

Meadows is correct. Although Dr. House's 2007 report gave some indication that Plaintiff reported that R.M. heard voices, it also clearly indicated that R.M. himself also told the doctor that he heard voices telling him to cut his eyebrows. (Tr. 613-14). In fact, Dr. House commented that R.M. reported hearing voices as recently as the day prior to the examination. (Tr. 614). R.M. reported hearing the same voices in 2009. (Tr. 633). Thus, the ALJ erred when she concluded that Dr. House's opinion was purely based on Meadows' report of R.M. hearing voices. Additionally, as an aside, the Court notes that the ALJ's description of the doctor's opinion was not entirely accurate. For example, the ALJ incorrectly stated that Dr. House's 2009 report showed that R.M.'s pace and persistence remained adequate; instead, as noted above, Dr. House actually indicated that R.M.'s pace and persistence were only one-half of the average functioning of a child his age.

Though it is clear the ALJ erred, remand on this basis would be a futile gesture. Dr. House's opinion was only critical to the ALJ's evaluation of R.M.'s limitations in one of the six domains, Attending and Completing Tasks. (Tr. 20-21). The ALJ relied upon the doctor's findings to conclude that R.M. only suffered from a "less than marked" limitation in this domain. However, even if the ALJ had fully accepted the doctor's opinion and concluded R.M. was markedly limited in this domain, the ALJ's ultimate ruling would not have changed. In order to be deemed disabled, a child claimant must have marked impairments in at least two domains or an extreme impairment in one domain. 20 C.F.R. § 416.926a(d). In the instant case, the ALJ did not find R.M. to suffer from an extreme or marked limitation in any domain. Consequently, even if the ALJ had found R.M. to have a marked limitation in Attending and Completing Tasks, this would not have been sufficient to render the child disabled.

13

Furthermore, the undersigned notes that neither Dr. House's opinion nor R.M.'s GAF score were directly mentioned by the ALJ in her analysis of R.M.'s functionality in the domain of Acquiring and Using Information. (Tr. 20). While Plaintiff makes much ado about Dr. House's rating of R.M.'s GAF score of 40, GAF scores are not "raw medical data" and do not necessarily reflect one's level of mental functioning. *See Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007). A low GAF score is not sufficient to overturn an ALJ's decision when other substantial evidence supports the finding of non-disability. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006) (citing *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469 (6th Cir. 2003)).

Here, there is substantial evidence supporting the ALJ's "less than marked" finding in the domain of Acquiring and Using Information. As noted by the ALJ, R.M.'s school psychologist, Brian Knoske, opined that R.M.'s poor behavior was interfering with his academic performance. (Tr. 18, 446). In addition, R.M.'s teacher, Jeffrey Priah, indicated that the child performed well in mathematics, but struggled with reading and comprehension. (Tr. 435). But, Mr. Priah also noted that Plaintiff's behavior affected his learning, in that he would act out instead of asking for help with difficult assignments. (*Id.*). Finally, the undersigned notes, as did the ALJ, that Plaintiff had a chronic problem with following-up with R.M.'s treatment at various facilities. (Tr. 17-18). It was reasonable for the ALJ to point out Plaintiff's repeated failure to follow through with treatment, as such efforts had the potential of improving R.M.'s condition. All these factors combined support the ALJ's "less than marked" finding in the area of Acquiring and Using Information, in spite of the GAF score noted by Dr. House.

## VII. DECISION

For the foregoing reasons, the Magistrate Judge finds the decision of the Commissioner is supported by substantial evidence. Accordingly, the decision is AFFIRMED.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date: March 30, 2013.